UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>-against-<br><br>TREND MED, INC, ANASTASIA MALAYDAKH, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,<br><br>Defendants. | CIVIL ACTION<br><br>24-CV-1929<br><br>COMPLAINT<br><br>(TRIAL BY JURY DEMANDED) |

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company (hereinafter "**Plaintiffs**"), by their attorneys, Morrison Mahoney LLP, for their Complaint against Defendants Trend Med, Inc ("Trend Med"), Anastasia Malaydakh ("Malaydakh") (Trend Med and Malaydakh are collectively referred to as "**Retail Defendants**"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1.      From at least November 2018 and continuing through the date of the filing of this Complaint, Defendants engaged in a scheme to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

2.      This action seeks to recover more than $109,000.00 that Defendants stole from Plaintiffs through the submission of hundreds of false and/or fraudulent insurance claims for perioperative and postoperative rehabilitative durable medical equipment ("DME") devices, in particular, Continuous Passive Motion ("CPM") machines and normothermia blanket warmer systems and full body blankets ("Bair Huggers") (alternatively referred to as "Rental DME"). As used herein, (i) "DME" generally refers to equipment and/or supplies used for medical purposes

by individuals in their homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools and compression devices; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes.  Such items include, but are not limited to, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

3.     At all relevant times mentioned herein, each and every piece of Rental DME supplied by Trend Med was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.     To execute the scheme to defraud alleged herein, Defendant Malaydakh, through the Trend Med, entered into separate arrangements with one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.     Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

(i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME, including Rental DME, to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Defendants, among others; and/or

(ii) fabricating and/or falsifying DME prescriptions by:

(a)  utilizing blank prescription forms signed by the HCPs unilaterally filled in to prescribe expensive and unnecessary DME; and/or

(b) utilizing templated prescription forms provided to the HCPs by Defendants containing boilerplate medical necessity language, falsely representing that the prescribed Rental DME was necessary for to meet the individual medical needs of each Covered Person; and/or

(iii) ensuring that the prescriptions were provided directly to Trend Med to endure that Trend Med could bill Plaintiffs to purportedly fill the prescription rather than allow the possibility that the Covered Person may fill the prescription at a DME retailer of their own choosing.

6.     The use of fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the Rental DME prescribed and dispensed to the patient, if any items were legitimately prescribed and dispensed at all; and/or (ii) misrepresent the medical necessity of the items that were dispensed to the patient, if any items were dispensed at all.

7.     Pursuant to the fraudulent prescriptions, Trend Med routinely provided (or purported to provide) expensive perioperative and/or postoperative rehabilitative Rental DME for the same and/or similar duration, as well as orthotic devices, to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Covered Persons"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

8.     On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9.     In many instances, Malaydakh submitted to Plaintiffs, through Trend Med, prescription forms which they knew to be fabricated in order to misrepresent the quality and medical necessity of Rental DME actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10.    After obtaining the fraudulent prescriptions from the No-fault Clinics Malaydakh, through Trend Med, generated and submitted bills to Plaintiffs, among others, knowingly

misrepresenting the nature and quality of the items, the amounts they were entitled to be reimbursed and/or the medical necessity of the purportedly prescribed Rental DME.

11.     In carrying out the scheme to defraud, Defendants stole in excess of $109,000.00 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

**STATUTORY/REGULATORY SCHEME**

12.     Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

13.     As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for Rental DME that were never provided, not provided as billed or, if provided, were otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Covered Persons received substantially similar DME and/or orthotic devices.  Exhibit "1" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs to Defendants for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

14.     Defendant Trend Med is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Trend Med accepted (and continues to accept) assignments of benefits from Covered Persons and submitted (and continues to submit) claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

15.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., Trend Med submitted (and continues to submit) claims to Plaintiffs using the claim forms prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), including the "No-Fault Assignment of Benefits Form" or form "NF-AOB" and a bill in the form of the "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form (such as the "Health Insurance Claim Form" or "CMS Form 1500").

16.     At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by Trend Med contained the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto…commits a fraudulent insurance act, which is a crime….

17.     At all relevant times mentioned herein, Trend Med identified the Rental DME it purported provided to Covered persons on the claim forms using Healthcare Common Procedure Coding System (HCPCS) Level II Codes, a standardized coding system maintained by the Centers for Medicare & Medicaid Services (CMS) used to identify services not identified in the American

Medical Association's Current Procedural Terminology (CPT) code set, including, *inter alia* durable medical equipment and orthotic devices.

18.     At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

19.      At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service-related expenses. Under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

20.     By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

21.     At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

22.     At all relevant times mentioned herein, Regulation 83 did not adopt the Workers' Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-authorization approval, time limitations within which health services must be performed, enhanced reimbursement for providers of certain designated services..."

23.     Effective October 6, 2004, the Department of Financial Services, through the Superintendent's promulgation of the 28th Amendment to Regulation 83 (11 N.Y.C.R.R. § 68 *et. seq.*), established a fee schedule for the reimbursement of durable medical equipment and medical supplies by adopting the New York State Medicaid fee schedules for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances.

24.     The 28th Amendment to Regulation 83 provided:

> [The] maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, in accordance with Medicaid rules, shall be the *lesser* of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (effective through July 10, 2007).

25.     Effective July 11, 2007, for DME and/or orthotic devices provided up to and including April 3, 2022, the WCB established a fee schedule for DME and orthotic devices by also adopting the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter the "Medicaid DME Fee Schedule"), 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021), which lists such devices by corresponding HCPCS Level II code.

26.     In view of the adoption by the WCB of the Medicaid DME Fee Schedule, on or about April 16, 2008, the DFS promulgated the 30th Amendment to Regulation 83, which repealed Part F of Appendix 17-C, since it was no longer needed due to the DFS' prior adoption of the WCB's fee schedule, which then included the Medicaid DME Fee Schedule that was, and is, in effect at all relevant times mentioned herein prior to April 4, 2022.

27.     Accordingly, at all relevant times mentioned herein for DME and/or orthotic devices provided prior to April 4, 2022, providers of DME are entitled to reimbursement in the amounts set forth in the Medicaid DME Fee Schedule.  At all relevant times mentioned herein for DME and/or orthotic devices provided prior to April 4, 2022, for Non-Medicaid DME Fee Schedule items, the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public. 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021) (sometimes referred to herein as the "Lesser of Standard").

28.     At all relevant times mentioned herein prior to April 4, 2022, under the Medicaid DME Fee Schedule, providers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule."  12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

29.     Furthermore, at all relevant times mentioned herein prior to April 4, 2022, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental

charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

30.     By Board Bulletin Numbers 046-1408, dated May 24, 2021, and 046-1496, dated February 3, 2022, the Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which was to become effective June 7, 2021, with the result that the Medicaid DME Fee Schedule and Lesser of Standard remained effective for Workers' Compensation and No-fault claims until the completion of Phase 2 of the WCB's implementation of its new electronic claims management system, OnBoard on April 4, 2022. New York Workers' Compensation Board Bulletin No. 046-1408 (May 24, 2021) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1408.jsp) and Bulletin No. 046-1496 (February 3, 2022) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1496.jsp).

31.     In relevant part, for DME and/or orthotic devices provided on or after April 4, 2022, the WCB established its own fee schedule for DME and orthotic devices to replace its prior adoption of the Medicaid DME Fee Schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances. (hereinafter "WCB DME Fee Schedule") *See* 12 N.Y.C.R.R. § 442.2(a) (WCB DME Fee Schedule and Medicaid DME Fee Schedule are collectively referred to as the "Fee Schedule").

32.     Like the Medicaid DME Fee Schedule, the WCB DME Fee Schedule listed DME and orthotic devices by their corresponding HCPCS Level II Codes.

33.     With respect to rental DME, at all relevant times mentioned herein on or after April

4, 2022, under the WCB DME Fee Schedule, providers of rental DME are limited to:

> The maximum permissible monthly charge for the rental of durable medical
> equipment shall be the rental price listed in the Official New York Workers'
> Compensation Durable Medical Equipment Fee Schedule multiplied by the
> total number of months or weeks respectively for which the durable medical
> equipment is needed. In the event the total rental charge exceeds the
> purchase price, the maximum permissible charge for the durable medical
> equipment shall be the purchase price listed in the Official New York
> Workers' Compensation Durable Medical Equipment Fee Schedule,
> whether or not the claimant keeps the durable medical equipment or returns
> it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2).

34.     Except as rendered inapplicable to reimbursement of No-fault claims by Regulation

83, the WCB DME Fee Schedule applies to the reimbursement of items listed in the WCB DME

Fee Schedule.

35.     Pursuant to Regulation 83, the requirements of prior authorization under the WCB

DME Fee Schedule does not apply to the reimbursement of claims under the No-fault law.

36.     The Department of Financial Services recognized that the WCB's elimination of

the Lesser of Standard for reimbursement of items not listed on the WCB DME Fee Schedule

creates a system, in the context of reimbursement under the No-fault law, for fraud and abuse, with

no cost-containment systems in place and the possibility for nefarious DME providers to bill for

DME at exorbitant, unchecked rates.

37.     To address the potential for fraud and abuse, by emergency adoption of the 36th

Amendment to Regulation 83 dated April 4, 2022, the DFS reinstated the Lesser of Standard for

reimbursement of DME under the No-fault law.

38.     By Emergency Adoptions dated June 30, 2022, September 27, 2022, and December 28, 2022, DFS extended its reinstatement of the Lesser of Standard for reimbursement of DME under the No-fault law, in each instance, for an additional 90 days.

39.     DFS promulgated its final Adoption of the 36th Amendment to Regulation 83, including its reinstatement of the Lesser of Standard and clarification as it relates to rental items, effective February 15, 2023, which states as follows:

**Part E. Durable medical equipment fee schedule.**

(a) This Part shall apply to durable medical equipment not listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule and to durable medical equipment listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule for which no fee for purchase, rental, or both has been assigned.

(b) As used in this Part, acquisition cost means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax.

(c) The maximum permissible purchase charge for such durable medical equipment shall be the lesser of the:

(1)     acquisition cost plus 50%; or

(2)     usual and customary price charged by durable medical equipment providers to the general public.

(d) (1) On and after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth of the acquisition cost to the provider. Rental charges for less than one month shall be calculated on a pro-rata basis using a 30-day month.

(2)     The total accumulated rental charge for such durable medical equipment shall be the least of the:

(i)     acquisition cost plus 50%;

(ii)    usual and customary price charged by durable medical equipment providers to the general public; or

(iii)   purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

https://www.dfs.ny.gov/system/files/documents/2023/02/rf_ins_83_amend36_text.pdf.

40.     At all times relevant times mentioned herein from April 4, 2022 through the present, with respect to DME items that are not listed on the WCB DME Fee Schedule and/or listed on the WCB DME Fee Schedule but for which no fee has been assigned (hereinafter "Non-WCB DME Fee Schedule" items) (Non-WCB DME Fee Schedule items and Non-Medicaid DME Fee Schedule items are collectively referred to as "Non-Fee Schedule" items), the maximum permissible reimbursement shall be determined by application of the Lesser of Standard as reflected in the Emergency Adoption of the 36th Amendment to Regulation 83 dated April 4, 2022, extended by Emergency Adoptions dated June 30, 2022, September 27, 2022, and December 28, 2022, and thereafter in the Final Adoption of the 36th Amendment to Regulation 83, effective February 15, 2023. 11 N.Y.C.R.R. § App.17-C Part E.

41.     At all relevant times mentioned herein from April 4, 2022, through the present, a provider's acquisition cost is "the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax. 11 N.Y.C.R.R. § App.17-C Part E(b) (promulgated by April 4, 2022, June 30, 2022, September 27, 2022, and December 28, 2022, Notices of Emergency Adoption, and Final Adoption effective February 15, 2023).

42.     At all times relevant herein, the WCB established that ambulatory surgery services shall be made according to the ambulatory patient groups ("APG") methodology. 12 N.Y.C.R.R. § 329-2.1. Under this methodology, the payment for routine ancillary services or drugs are often packaged within (or deemed as included) in the applicable APG payment for a related significant procedure or medical visit. *See* 12 N.Y.C.R.R. § 329-2.2(k).

43.     At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

44.     Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

45.     At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by Malaydakh, through Trend Med, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the Rental DME provided, if provided at all, as well as the nature, quality, and medical necessity of the billed-for Rental DME. To the extent the Rental DME were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need, and was billed in an amount far in excess of what the Retail Defendants were entitled to be reimbursed.

46.     On information and belief, in furtherance of the scheme to defraud alleged herein, Trend Med as a matter of pattern, practice and protocol, routinely provided Covered Persons with expensive Rental that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

47.     As part of a fraudulent protocol of treatment, after receiving a standard battery of medical treatment, including the provision of several pieces of DME such as cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools; back braces, cervical collars, knee braces, and/or shoulder braces, many of the Covered Persons are eventually referred for arthroscopic surgery at

ambulatory surgical centers ("ASCs") throughout New York and New Jersey.  These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medical necessary.  On the same day as the surgery, and within a few short days after the surgery, Trend Med, among others, delivers to the Covered Persons expensive rental and/or compression devices that are not medically necessary and/or are provided pursuant to a kickback arrangement or for other financial consideration.  In many cases, the Covered Persons receive up to four or more such medically unnecessary items from the providers of rental and/or compression devices, for up to 28 days or longer, in some cases exceeding $6,000.00 in a total cost for all of the items, as part of the scheme to financially enrich the providers expensive rental and/or compression devices, and Trend Med in particular, through a fraudulent protocol of treatment, all while significantly diminishing the coverage available for medically necessary services, to the extent the Covered Persons were actually injured and in need of treatment.

48.     On information and belief, Trend Med was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

49.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any Rental DME at all, provided Covered Persons with medically unnecessary equipment pursuant to a pre-determined treatment protocol and/or inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

50.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud—

although that would be troubling enough—rather, they adopted fraudulent blueprints as their business plans and used them to participate in systematic patterns of racketeering activity. Every facet of Defendants' operations, from securing fraudulent prescriptions for DME and/or orthotic devices pursuant to a predetermined course of treatment, that misrepresented the nature, quality, cost, and medical necessity for the Rental DME purportedly provided, was carried out for the purpose of committing fraud.

51.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME and/or orthotic devices. In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of  Retail Defendants' No-fault claims because Malaydakh, through Trend Med, submitted (1) false and fraudulent insurance claims for medically unnecessary Rental DME to Plaintiffs deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiffs for Rental DME that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity. Such claims continue to be submitted by and/or in the name of Trend Med and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

52.     By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing a representative sample in excess of $71,000.00 in unpaid No-fault claims that form the basis of Plaintiffs' request for declaratory relief.

## NATURE OF THE ACTION

53.     This action is brought pursuant to:

i)      The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii)     New York State common law; and

iii)    the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## NATURE OF RELIEF SOUGHT

54.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, which they sustained as a result of the Defendants' scheme to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiffs for DME and/or orthotic devices they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

55.     Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of Trend Med' unpaid No-fault claims because:

i)      The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiffs; and/or

ii)     The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for Rental DME that were provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

56.     As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $109,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for DME and/or orthotic devices that were

never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

### A.    Plaintiffs

57.    Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

58.    Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

59.    Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

60.    Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

61.    Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company are collectively referred to herein as "Plaintiffs."

62.    Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

**B.**     **The Individual Defendant**

63.     Anastasia Malaydakh ("Malaydakh") is a natural person residing in the State of Florida, is the principal, officer, and/or director of Retailer Defendant Trend Med, and, at all times relevant herein, operated, managed, and/or controlled their activities.

**C.**     **The Retailer Defendant**

64.     Trend Med, Inc ("Trend Med") was incorporated on or about November 5, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 92-36 Queens Boulevard, Rego Park, NY 11374.   Trend Med is operated, managed, and/or controlled by Defendant Malaydakh and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

**D.**     **The John Doe Defendants**

65.     On information and belief, John Does 1 through 5 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**E.**     **The ABC Corporations**

66.     On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiffs that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme.   These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

67.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

68.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

69.     This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

70.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

71.     Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

72.     Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

73.     As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

74.     Trend Med is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Trend Med accepts assignments of benefits from Covered Persons covered under the No-fault Law and submits claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

75.     To process and verify the claims submitted by Trend Med, Plaintiffs required, and Trend Med submitted, prescriptions and other documents relating to the Rental DME allegedly supplied to Covered Persons for which Trend Med was seeking reimbursement from Plaintiffs.

76.     In nearly all instances, the prescriptions submitted in support of Trend Med's claims for reimbursement were fraudulent, fabricated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

77.     At all relevant times mentioned herein, in each bill submission to No-fault insurers in general, and Plaintiffs in particular, Trend Med made the following representations to each recipient:

- The bill for Rental DME was based on a valid prescription by a healthcare practitioner licensed to issue such prescriptions;

- The prescription for Rental DME was not issued pursuant to any unlawful financial arrangements;

- The Rental DME identified on the bill was actually provided to the Covered person based on a valid prescription identifying medically necessary items; The billing code used on the bill actually represents the DME and all included services that was provided to the Covered Person; and

- The fee sought for the billed for Rental DME did not exceed that permissible under the No-fault law and regulations.

78.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process Trend Med's claims within 30 days of receipt of proof of claim.

79.     To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Trend Med in support of its claims, and paid Trend Med based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiffs.

80.     At all relevant times mentioned herein, the No-fault Law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).

81.      At all relevant times mentioned herein, for DME and orthotic devices provided to Covered Persons prior to April 4, 2022, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2 (effective through June 7, 2021).

82.     At all relevant times mentioned herein prior to April 4, 2022, with respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Medicaid DME Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

    (1)     the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or

    (2)     the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2. (effective through June 7, 2021).

83.     At all relevant times mentioned herein prior to April 4, 2022, the regulation provides that suppliers of rental DME were limited to a maximum permissible monthly rental

charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule." 12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

84.    Furthermore, at all relevant times mentioned herein prior to April 4, 2022, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

85.    On April 4, 2022, the WCB's amendments to the fee schedule by the WCB took effect, including the establishment of the WCB DME Fee Schedule. As part of the WCB's establishment of the WCB DME Fee Schedule, the available DME on the Fee Schedule was updated, the reimbursement rates were increased, and a prior authorization process was established for certain DME in the WCB DME Fee Schedule for which no reimbursement rate is listed and/or for DME not listed in the WCB DME Fee Schedule. As a result of these amendments, the WCB eliminated the prior Lesser of Standard that had existed for Non-Fee Schedule items.

86.    Accordingly, at all relevant times mentioned herein for DME and/or orthotic devices provided on or after April 4, 2022, the Worker's Compensation Board has adopted its own fee schedule for DME and orthotic devices to replace its prior adoption of the fee schedule set by

22

the New York State Medicaid Program. 12 N.Y.C.R.R. § 442.2. New York Workers'

Compensation Board Bulletin Nos. 046-1408 (May 24, 2021), 046-1496 (Feb. 3, 2022).

87.     At all times mentioned herein on or after April 4, 2022, for WCB DME Fee

Schedule rental DME, the fee payable shall be:

> The maximum permissible monthly charge for the rental of durable medical equipment shall be the rental price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule multiplied by the total number of months or weeks respectively for which the durable medical equipment is needed. In the event the total rental charge exceeds the purchase price, the maximum permissible charge for the durable medical equipment shall be the purchase price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule, whether or not the claimant keeps the durable medical equipment or returns it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2).

88.     In view of the WCB's elimination of the Lesser of Standard, resulting in the absence

of a cost control measure for Non-WCB DME Fee Schedule items and the potential for exorbitant

prices and unlimited rental charges that could far exceed the purchase price of the DME, the DFS

Superintendent deemed it necessary to adopt an emergency amendment to 11 N.Y.C.R.R. § 68

(Regulation 83) to cap the purchase and total accumulated rental prices for Non-WCB Fee

Schedule items.

89.     Accordingly, at all relevant times mentioned herein on or after April 4, 2022, for

Non-WCB Fee Schedule DME, the fee payable shall be: "[t]he maximum permissible purchase

charge or the total accumulated rental charge for such durable medical equipment shall be the

lesser of the: (1) acquisition cost plus 50%; or (2) usual and customary price charged by durable

medical equipment providers to the general public." 11 N.Y.C.R.R. § App.17-C Part E(c)

(promulgated by April 4, 2022, June 30, 2022, September 27, 2022, and December 28, 2022

Notices of Emergency Adoption); *accord* 11 N.Y.C.R.R. § App.17-C Part E (c) (Final Adoption

effective February 15, 2023).  Moreover, at all relevant times mentioned herein on or after June 1, 2023, for the rental of DME either not listed on the WCB Fee Schedule, or listed without a maximum permissible rental charge, the "maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth of the acquisition cost to the provider. Rental Charges for less than one month shall be calculated on a pro-rata basis using a 30-day month." 11 N.Y.C.R.R. § App.17-C Part E(d)(1) (Final Adoption effective February 15, 2023). As used in the regulation, "*acquisition cost* means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax." 11 N.Y.C.R.R. § App.17-C Part E (b) (promulgated by Notices of Emergency Adoption issued April 4, 2022, June 30, 2022, September 27, 2022, and December 28, 2022, and Final Adoption effective February 15, 2023).

90.     At all times relevant herein, routine ancillary services performed at ASCs are included in the facility fee billed by the ASCs for related significant procedures or medical visits, and are not separately reimbursable.

91.      Trend Med was created in connection with an elaborate scheme to fraudulently bill No-fault insurance carriers for Rental DME that were never provided, were not provided as billed or, if provided, were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all Covered Persons received the Rental DME as part of the same or similar battery of DME and/or orthotic devices.

92.     The Rental DME that Trend Med purported to provide, and for which it billed Plaintiffs, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury.  Instead, Malaydakh, through Trend Med, created a billing apparatus which

implemented a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

93.      Malaydakh created and controlled Trend Med, which was part of a well-organized illegal enterprise that engaged in pervasive fraudulent practices that distinguished it from legitimate providers of Rental DME.  The components of the enterprise followed practices that were part of a racketeering scheme dictated by Malaydakh, including, but not limited to, one or more of the following practices:

- Unlike legitimate retail DME companies, Malaydakh, through Trend Med, misrepresented the nature, quality, and necessity of Rental DME purportedly provided to Covered Persons;

- Unlike legitimate retail DME companies, Malaydakh, through Trend Med, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Malaydakh, through Trend Med, submitted bills to Plaintiffs for Rental DME that were never provided to Covered Persons, and/or not provided as billed;

- Unlike legitimate retail DME companies, Malaydakh, through Trend Med, misrepresented the wholesale costs and/or usual and customary price of the Non-Fee Schedule items purportedly supplied to Covered Persons;

- Unlike legitimate retail DME companies, Malaydakh, through Trend Med, concealed the fact that the Rental DME were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Malaydakh, through Trend Med, concealed the fact that the prescription forms submitted in support of their claims for reimbursement were issued in order to maximize reimbursement regardless of medical necessity;

- Unlike legitimate retail DME companies, Malaydakh, through Trend Med, and/or those acting under their direction and control, had agreements and/or understandings as to what Rental DME would be prescribed by the HCPs;

- Unlike legitimate retail DME companies, Malaydakh, through Trend Med, arranged to have prescriptions for Rental DME delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME retailers; and

- Unlike legitimate retail DME companies, Malaydakh, through Trend Med, entered into illicit relationships with the No-fault Clinic, which, in exchange for kickbacks and/or a fee, provided Trend Med with prescriptions and/or referrals for Rental DME pursuant to a predetermined course of treatment, irrespective of medical necessity.

94. In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

95. The members of the enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises. By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, Malaydakh engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) ensure that their HCPs prescribed large amounts of virtually identical DME to their patient population, (ii) provided the HCPs with template form prescriptions with boilerplate language, in order to misrepresent the medical necessity of the prescribed DME and conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Submitted or caused to be submitted, on behalf of Trend Med, numerous fraudulent claim forms seeking payment for Rental DME that were purportedly (but not actually) provided to many Covered Persons;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

96. At all relevant times mentioned herein, Malaydakh knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Rental DME.

97. At all relevant times mentioned herein, Malaydakh, through Trend Med, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or

caused to be submitted the fraudulent prescription and/or claim forms, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

98.     At all relevant times mentioned herein, Malaydakh and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

99.     Beginning in or about November 2018, and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the alleged provision of compression devices, sustained acoustic medicine machines, and/or orthotic devices to Covered Persons.

100.    Malaydakh formed, owned and/or controlled Trend Med for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

101.    Trend Med, through Malaydakh, engaged in a pervasive scheme to defraud, wherein Malaydakh: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of Rental DME; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) arranged for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery receipt forms signed by Covered Persons on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (iv) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for Rental DME that were purportedly provided to Covered Persons based on medical necessity when, in fact, Malaydakh, through Trend Med, determined the

DME that would be prescribed by the No-fault Clinics, with virtually every Covered Person receiving substantially similar DME and/or orthotic devices for a substantially similar timeframe.

102.   Defendants devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive Rental DME that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, materially misrepresented in their fraudulent bill submissions to Plaintiffs.

103.   Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements, would issue a prescription for a standard battery of DME and/or orthotic devices, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary, including but not limited to prescriptions for Rental DME.

104.   Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

105.   As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with one or more of the Retail Defendants, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to Trend Med by causing their HCPs to write DME prescriptions in accordance with a pre-determined protocol.

106.     In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for Rental DME.  Instead, these prescriptions were given directly to Trend Med to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of DME and/or orthotic devices.

107.     Furthermore, as part of the kickback or other financial compensation agreement with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

108.     In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, virtually every bill submitted by Trend Med deliberately obscured identifying information relating to the billed-for Rental DME so as to prevent Plaintiffs from determining the appropriate charges associated with any such Rental or whether the specific Rental DME was medically necessary.

109.     As a matter of pattern, practice and protocol, Trend Med routinely provided Covered Persons with expensive CPM machines that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals to maximize reimbursement.

110.     In furtherance of the predetermined fraudulent protocol of treatment, in numerous instances, the Rental DME prescribed were not documented in the medical report of the prescribing HCPs by whom Covered Persons were treated.  To the extent that any of the medical records did identify the Rental DME purportedly prescribed, the records did not explain the medical necessity for the Rental DME, did not identity or reference all of the Rental DME listed on the prescriptions, and in some instances, identified Rental DME that was not included on the

prescriptions issued by the HCPs.  On many occasions, the prescriptions for Rental DME purportedly issued by the HCPs were issued on dates that the Covered Persons did not treat with the HCPs. In addition, on many occasions, the prescriptions for Rental DME purportedly issued by the HCPs were left undated, obscuring when the prescription was issued and when legitimately prescribed DME would have been noted in the prescribing HCP's treatment notes.  By way of example and not limitation:

- On August 30, 2019, in the midst of a course of treatment at a No-Fault Clinic located at 265 Avenue X, Brooklyn, NY, Covered Person S.E. claim no. 0546470543-02 presented at Surgery Center of Oradell (not named a defendant in the Complaint) for an arthroscopic procedure yet the operative report made no mention of a prescription or recommendation for the preoperative, perioperative, or postoperative use of a Bair Hugger. Notwithstanding, Trend Med submitted a bill with a prescription, dated August 30, 2019, purportedly signed by the surgeon prescribing a Bair Hugger for the preoperative, perioperative, and postoperative measurement of core body temperature at the ASC.

- On August 5, 2020, in the midst of a course of treatment at a No-Fault Clinic located at 552 East 180 Street, Bronx, NY, Covered Person K.H. claim no. 0580237063-01 presented at Regency Healthcare Medical PLLC (not named a defendant in the Complaint) for an arthroscopic procedure yet the operative report made no mention of a prescription or recommendation for the preoperative, perioperative, or postoperative use of a blanket warmer system.  Notwithstanding, Trend Med submitted a bill with a prescription, dated August 5, 2020, purportedly signed by the surgeon prescribing a blanket warmer system for the preoperative, perioperative, and postoperative measurement of core body temperature at the ASC.

- On November 23, 2020, in the midst of a course of treatment at a No-Fault Clinic located at 147-14 Sanford Avenue, Flushing, NY, Covered Person T.H. claim no. 0607393154-01 presented at Global Surgery Center (not named a defendant in the Complaint) for an arthroscopic procedure yet the operative report made no mention of a prescription or recommendation for the preoperative, perioperative, or postoperative use of a Bair Hugger. Notwithstanding, Trend Med submitted a bill with a prescription, dated November 23, 2020, purportedly signed by the surgeon prescribing a Bair Hugger for the preoperative, perioperative, and postoperative measurement of core body temperature at the ASC.

- On June 22, 2021, in the midst of a course of treatment at a No-Fault Clinic located at 54 West Merrick Road, Valley Stream, NY, Covered Person A.B.

claim no. 0612946343-03 presented at Surgicore Surgical Center LLC (not named a defendant in the Complaint) for an arthroscopic procedure yet the operative report made no mention of a prescription or recommendation for postoperative rehabilitation using a CPM device.  Notwithstanding, Trend Med submitted a bill with a prescription, dated June 22, 2021, purportedly signed by the surgeon prescribing a CPM device for a four-week rental period.

- On November 8, 2021, in the midst of a course of treatment at a No-Fault Clinic located at 150-01 Northern Boulevard, Flushing, NY, Covered Person T.E. claim no. 0634838032-02 presented at Rockland and Bergen Surgery Center (not named a defendant in the Complaint) for an arthroscopic procedure and thereafter for follow-up exams with the surgeon on December 9, 2021 and December 16, 2021, yet neither the operative report, not the follow-up exam reports made any mention of a prescription or recommendation for postoperative rehabilitation using a CPM device. Notwithstanding, Trend Med submitted a bill with a prescription, dated November 10, 2021, purportedly signed by the surgeon prescribing a CPM device for a six-week rental period.

111.    The foregoing are non-exhaustive examples of claims for Rental DME submitted to Plaintiffs by Trend Med, in which the absence of any mention of the prescribed Rental DME on the prescribing HCP's medical reports demonstrates that the Rental DME was prescribed and pursuant to a predetermined treatment protocol irrespective of medical necessity.

112.    Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

## FRAUDULENT BILLING OF RENTAL DME ITEMS

113.    In furtherance of the scheme to defraud alleged herein, Trend Med, as a matter of pattern, practice, and protocol, routinely provided Covered Persons with expensive Rental DME items that were medically unnecessary and provided, on information and belief, as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

114.     As part of the scheme, the Covered Persons receiving the expensive rental CPM Machines were involved in minor accidents, suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment.  Shortly after the accident, the Covered Persons are referred for a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other services, physical therapy, chiropractic treatment, acupuncture, and several pieces of DME and/or orthotic devices—in some instances, receiving up to ten (10) or more items.

115.     Months after the accident, as part of the fraudulent protocol of treatment, many of the Covered Persons are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.  These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

116.     On the same day as the surgery, and within a few short days after the surgery, the Covered Persons are prescribed expensive Rental DME and/or compression devices, as part of a pattern and protocol of treatment to maximize reimbursement for items that were not medically necessary and/or were provided pursuant to a kickback arrangement or for other financial consideration.  In many cases, the Covered Persons receive at least four or more such items, for up to 28 days or longer, in some cases exceeding $9,000.00 in a total cost for all of the items. By way of example and not limitation, the following Covered Persons received the same or similar battery of standard DME and orthotic devices, and rental DME including CPM machines and/or Bair Huggers purportedly provided by Defendants:

- In connection with claims submitted on behalf of Covered Person S.G., claim number 0608879383-02, following S.G.'s purported treatment at the No-fault Clinic located at 552 East 180 Street, Bronx, NY, Plaintiffs were billed for at least nineteen pieces of regular DME provided by a single company amounting to $13,258.88. On February 23, 2020, Marta Medical Supply Corp. (not named as a defendant in the Complaint) purportedly provided an eggcrate mattress for $155.52, a lumbar cushion for $519.64, a cervical pillow for $22.04, a bed board for $101.85, a cervical traction unit with pump for $1,265.35, an LSO for $759.92, a knee brace for $634.53, a shoulder support for $896.92, a cervical collar for $130, and an orthopedic car seat for $756.03.. On January 15, 2021, Marta Medical Supply Corp also purported to provide a second, more expensive LSO for $1,150, a second, more expensive knee brace for $1,754.51, and a second, more expensive shoulder support for $1,519.48. On January 19, 2021, Marta Medical Supply Corp also purported to provide an ultraviolet therapy system for $673.94, a TENS unit for $535.26, a TENS positioning belt for $82.50, a whirlpool for $1,610.55, and a back massager for $188.21. On January 20, 2021, Marta Medical Supply Corp purportedly provided a second cervical traction unit for $502.63. Thereafter, Plaintiffs were billed for at least ten pieces of perioperative and/or postoperative rental DME along with related appliances and post-operative orthotic devices purportedly provided by three different companies amounting to $6,854.43. On March 3, 2023, the same day Covered Person S.G. purportedly underwent arthroscopic shoulder surgery, Defendant Trend Med purportedly provided a Bair Hugger with accompanying full body blanket, for a single day rental for use preoperatively, perioperatively and postoperatively at the ASC for $234.75. That same day, Lima Supply Inc (not named a defendant in the Complaint) purportedly provided a pneumatic compression device for a single day rental for use at the ASC for $285.00, along with accompanying appliance for $56.04, and shoulder support for $111.07. Starting three days later on March 6, 2021, Defendant Trend Med, purportedly provided a Shoulder CPM device for a forty-two-day rental period for the total amount of $4,452.00, with accompanying sheepskin pad for $19.50. Also starting March 6, 2023, Matech Ortho, Inc (not named a defendant in the Complaint) purportedly provided a cold compression device for a twenty-one-day rental period for the total amount of $1,585.50, along with accompanying appliance for 111.07. Plaintiffs were ultimately billed $20,113.31 in connection with at least twenty-nine pieces of DME.

- In connection with claims submitted on behalf of Covered Person W.J., claim number 0626462196-03, following S.G.'s purported treatment at the No-fault Clinic located at 1975 Linden Boulevard, Elmont, NY, Plaintiffs were billed for at least thirteen pieces of regular DME provided by a single company amounting to $4,966.93. On, April 27, 2021, Prompt Direct Supply Corp (not named as a defendant in the Complaint) purportedly

provided a cervical pillow for $22.04, a cervical collar for $233.00, a bed board for $101.85, an eggcrate mattress for $153.13, a lumbar cushion for $282.40. an LSO for $759.92, an EMS unit for $276.25, an EMS placement belt for $83.79, a back massager for $295.00, and an infrared heat lamp for $210.00. On June 15, 2021, Prompt Direct Supply Corp also purported provided a second LSO for $1,150.00, a shoulder support for $896.92 and a cervical traction unit for $502.63.  Thereafter, Plaintiffs were billed for at least eight pieces of rental DME and related appliances purportedly provided by six different companies, amounting to $9,210.42.  On July 10, 2021, the same day Covered Person W.J. purportedly underwent arthroscopic shoulder surgery, Floral Med Supply Inc (not named a defendant in the Complaint) purportedly provided a Bair Hugger with accompanying full body blanket, for a single day rental for use preoperatively, perioperatively and postoperatively at the ASC for $242.75. That same day, Good Medica Inc (not named a defendant in the Complaint) purportedly provided a VenaFlow Elite compression device for a single day rental for use at the ASC for $531.06, along with accompanying appliance for $89.56.  Also, that same day, Exact Orthomed Inc (not named a defendant in the Complaint) purportedly provided a cold compression device for a single day rental for use at the ASC for $293.37, along with accompanying appliance for $56.04, and shoulder support for $111.07. Starting three days later on July 13, 2021, Defendant Trend Med, purportedly provided a Shoulder CPM device for a forty-two-day rental period for the total amount of $4,452.00, with accompanying sheepskin pad for $19.50. Also starting July 13, 2021, Matech Ortho, Inc (not named a defendant in the Complaint) purportedly provided a cold compression device for a twenty-eight-day rental period for the total amount of $2,114.00, along with accompanying appliance for 111.07. Starting July 14, 2023, Limelite Recovery Inc (not named a defendant in the Complaint) purportedly provided a limb compression device for a twenty-six-day rental period for the total amount of $1,794.00.  Plaintiffs were ultimately billed $14,177.35 in connection with at least twenty-five pieces of DME.

- In connection with claims submitted on behalf of Covered Person M.A., claim number 0643918576-02, following M.A.'s purported treatment at the No-fault Clinic located at 71 South Central Avenue,  Valley Stream, NY, Plaintiffs were billed for at least six pieces of regular DME provided by a single company amounting to $1,606.03. On, October 18, 2023, Titan Equipment (not named as a defendant in the Complaint) purportedly provided an orthopedic car seat for $756.03.  On October 28, 2023, Titan Equipment also purportedly provided a cervical pillow for $22.04, a cervical collar for $233.00, a bed board for $157.21, an eggcrate mattress for $155.52, and a lumbar cushion for $282.40  Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting October 19, 2021, Bingo Supplies Inc. (not named a defendant in the Complaint) purportedly provided the following pain management rental DME: a cold compression device, for a twenty-eight-

day rental period, for $1,954.40, with accompanying wrap for a twenty-eight day rental period for $420.00, and a Pain Shield Portable Ultrasound unit for a twenty-eight-day rental period for $706.72, with accompanying replacement PS patches for $3,134.46, for the total amount of for $5,862.22. Thereafter, Plaintiffs were billed for at least ten pieces of rental DME and related appliances and orthotic devices purportedly provided by four different companies, amounting to $6,253.45. On February 23, 2022, the same day Covered Person W.J. purportedly underwent arthroscopic knee surgery, Defendant Trend Med purportedly provided a Bair Hugger with accompanying full body blanket, for a single day rental for use preoperatively, perioperatively and postoperatively at the ASC for $234.75. That same day, Good Medica Inc (not named a defendant in the Complaint) purportedly provided a VenaFlow Elite compression device for a single day rental for use at the ASC for $531.06, along with accompanying appliance for $89.56. Also, that same day, Exact Orthomed Inc (not named a defendant in the Complaint) purportedly provided a cold compression device for a single day rental for use at the ASC for $293.37, along with accompanying appliance for $56.04, and cane for $18.75. Starting March 7, 2022, Equip Services Inc (not named a defendant in the Complaint) purportedly provided a Knee CPM device for a forty-two-day rental period for the total amount of $3,147.90, with accompanying sheepskin pad for $19.50, and a cryotherapy device for a forty-two-day rental period for the total amount of $1,863.12. Plaintiffs were ultimately billed $13,721.70 in connection with at least twenty pieces of DME.

**1      Fraudulent billing for Continuous Passive Motion machines**

117.    In furtherance of the scheme to defraud alleged herein, Malaydakh, through Trend Med, routinely submitted bills to Plaintiffs for Continuous Passive Motion ("CPM") devices that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary and/or never provided.

118.    In keeping with the fact that the CPM devices were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the prescriptions issued by the HCPs were issued on template, pre-printed prescriptions forms that contained the same exact boilerplate language ostensibly explaining the medical necessity for the device, along with the physicians generic statement concerning the efficacy of the device. There is, however, no discussion of any of the Covered Persons' individual needs and diagnoses, nor any explanation

how the device will assist the specific Covered Person.  By way of example and not limitation, Exhibit "3" in the accompanying Compendium of Exhibits is a representative sample of prescriptions with the identical, boilerplate language.

119.    CPM is a modality of post-surgical treatment in which joint motion is provided by a machine without active contraction of muscle groups. A CPM device allows passive movement to be performed to a joint for hours at a time. The theory behind CPM is that recovery will be accelerated by decreasing soft tissue stiffness, increasing range of motion, and promoting healing of joint surfaces in soft tissues, and preventing the development of adhesions. A typical CPM device consists of a carriage for support of the extremity and a controller that is programmed to passively flex and extend the joint through a set range of motion, speed, pause and duration.

120.    CPM devices have no medical utility in limited post-operative circumstances, such as total knee replacements, and other knee indications including rehabilitation following repair of an anterior cruciate ligament prior to active physical therapy.

121.    CPM is not medically useful as a treatment following basic arthroscopic surgical procedures, does not provide any long-term benefit to post-operative management of patients, is no more effective than standard physical therapy and is not supported by the medical literature:

- A systematic review of rehabilitation methods after arthroscopic rotator cuff repair was done by Anthony Yi, et al., and published in the journal *Sports Health* in 2015 (7:326-334), which concluded that it is unknown whether CPM offers any benefit after shoulder surgery.  In addition, research has shown that CPM does not have any advantage for patients having knee surgery. For example, in patients having a total knee replacement, the American Association of Orthopedic Surgery (AAOS) has a Guideline that states: "Strong evidence supports that CPM after knee arthroplasty does not improve outcomes."

- A Cochrane Review was published that involved an analysis of multiple articles, and their conclusion was: *CPM does not have clinically important*

*effects on active knee flexion ROM, pain, function, or quality of life to justify its routine use.* In addition, in a study by Herbold, et al., a matched cohort of patients with total knee replacement were compared, and their conclusion was: *The outcome variables of 61 matched pairs of CPM users and non-CPM users were reported. No statistically significant differences were found in any of the outcomes.*

- A study published in the July 1998 Journal of Bone and Joint Surgery comparing the results of 31 patients randomly assigned CPM therapy or manual passive range of motion exercises for post-operative management of rotator cuff repair, found no significant differences in Shoulder Pain and Disability index scoring for pain and functional disability of each group, and no significant differences between the two groups with regard to the range of motion or strength.

- A study published in the July 16, 2014, Journal of Bone and Joint Surgery comparing the results of 40 patients post treatment of intra-articular knee fractures around the knee, randomly assigned CPM or standardized physical therapy for 48 hours immediately following surgery, found that CPM significantly improved knee flexion in the first 48 hours. However, there was no significant difference in knee pain at 48 hours, no other knee flexion or extension detected at any other time and no benefit of CPM in the immediate post-operative period with regard to knee motion at six months.

122. In addition to these studies, the Centers for Medicare and Medicaid Services ("CMS") issued a National Coverage Determination concluding that CPMs are only necessary after total knee arthroplasty, anterior cruciate ligament repair or reconstruction, after cartilage grafting procedures during the non-weight-bearing period to promote healing, and surgical release of arthrofibrosis of any joint.

123. CMS also stated that CPMs should be provided within 48 hours after surgery and that there is insufficient evidence to justify the use of CPMs beyond 21 days.

124. Notwithstanding that CPM devices are not medically useful as a treatment following routine knee and shoulder arthroscopic surgical procedures such as those performed on Covered Persons, Malaydakh, through Trend Med, and pursuant to illicit kickback agreements

with the HCPs, filled needless prescriptions for CPM devices to Covered Persons who purportedly underwent such procedures.

125.     Notwithstanding the lack of medical literature supporting the use and/or provision of CPM devices for patients that undergo routine arthroscopic procedures, as a matter of pattern, practice and protocol, such devices were routinely prescribed to Covered Persons and supplied by Trend Med pursuant to a pre-determined protocol of treatment and fraudulent scheme to maximize reimbursement.

126.     Despite the fact that CPMs are not medically necessary for the injuries suffered by most, if not all the Covered Persons, and the lack of sufficient evidence to justify their use beyond 21 days, Trend Med routinely filled prescriptions systematically provided by the HCPs for CPMs to be used for anywhere between 3 and 6 weeks.

127.     Although CPM units can be purchased from legitimate companies for less than Trend Med's accumulated monthly charges for the particular items, Trend Med systematically represent that the inexpensive CPMs dispensed to Covered Persons are high-quality and expensive units by submitting monthly charges that far exceed the true value of the products.

128.     Specifically, Malaydakh, through Trend Med, routinely submitted bills to Plaintiffs for the rental of CPM devices for use on joints other than the knee at an inflated daily rate of $106.00 per day per patient, using billing code E0936, resulting in total charges in amounts ranging from $1,802.00 to $6,254.00 per patient.

129.     In addition, Malaydakh, through Trend Med, routinely submitted bills to Plaintiffs for the rental of CPM devices for use on the knee, at an inflated daily rate of $83.00 per day per patient, using billing code E0935, resulting in total charges in amounts ranging from $1,162.00 to $3,486.00 per patient.  Exhibit "4" in the accompanying Compendium of Exhibits is a

spreadsheet containing a representative sample of claims wherein Trend Med submitted fraudulent bills for the rental of CPM Devices to Plaintiffs using billing codes E0935 and/or E0936.

130.    Notwithstanding that the Medicare rate for a CPM is only $21.50 per day, and the recently adopted WCB DME Fee Schedule rates for Knee CPMs and CPMs for other limbs are only $18.88 per day and $31.19 per day, respectively, the charges by Trend Med far exceed these rates and are grossly inflated in order to maximize their reimbursement in furtherance of the scheme to defraud.

### 2.    Fraudulent billing for Normothermia Blanket Warmer Systems

131.    In furtherance of the scheme to defraud alleged herein, Malaydakh, through Trend Med, routinely submitted bills to Plaintiffs for normothermia blanket warmer systems with full body blankets ("Bair Huggers") that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary, never provided and/or not reimbursable under the No-fault Law.

132.    In keeping with the fact that the Bair Huggers were not medically necessary and were billed for pursuant to a predetermined treatment protocol, the prescriptions issued by the HCPs, were issued on one of two boilerplate, pre-printed prescription forms, at least one of which created by Defendants themselves, that contained the same exact boilerplate language ostensibly explaining the medical necessity for the device, along with the physicians generic statement concerning the efficacy of the device.  There is, however, no discussion of any of the Covered Persons' individual needs and diagnoses, nor any explanation how the device will assist the specific Covered Person.  By way of example and not limitation, Exhibit "5" in the accompanying

Compendium of Exhibits are representative samples of the two prescription forms used, which, within each sample, contain identical, boilerplate language.

133.    A Bair Hugger is a forced-air warming system whereby warm air is forced through a disposable blanket to evenly spread heat around a patient's body in a hospital setting prior to, during, and immediately following a surgery.

134.    On information and belief, Bair Huggers are intended for use in the prevention of hypothermia in a surgical setting, yet there is no statistical difference in the use of forced-air warming versus standard warm-blanket intervention in the rewarming rate of surgical patients with mild and moderate hypothermia.

135.    On information and belief, the risk of hypothermia is low during simple, routine procedures such as shoulder or knee arthroscopies.

136.    On information and belief, forced warm air methods of maintaining a patient's temperature in the surgical setting can disrupt air flow in the operating room, potentially raising the risk of infection.

137.    Notwithstanding that Bair Huggers are not medically necessary during routine knee and shoulder arthroscopic surgical procedures such as those performed on Covered Persons, Malaydakh, through Trend Med, and pursuant to illicit kickback agreements with the HCPs, filled needless prescriptions for Bair Huggers to Covered Persons who purportedly underwent such procedures.

138.    Moreover, to the extent Bair Huggers were purportedly used at the ASCs on Covered Persons, they are not independently reimbursable under the No-fault Law.

139.    Bair Huggers are not DME provided to Covered Persons for their use, but medical equipment purportedly employed by ASCs for the purpose of warming Covered Persons and

monitoring Covered Persons' core temperature by ASC employees at each surgical stage to help prevent unintended hypothermia.

140.    Accordingly, the employment of Bair Huggers on Covered Persons is a service provided by the ASCs, to be billed, if reimbursable at all, by the ASCs as part of their facility fee determined using the APG method, not Trend Med under the Fee Schedule.

141.    Notwithstanding the foregoing, Trend Med routinely fraudulently billed Plaintiffs for Bair Huggers used by the ASC on the Covered Persons by billing for a Normothermia System under code E1399 for a single day rental at an ASC for $215.00, and the accompanying full body blanket component under code A9900 for $19.75.

142.    Exhibit "6" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims wherein Trend Med submitted fraudulent bills for the Bair Huggers to Plaintiffs using billing codes E1399 and A9900.

## DISCOVERY OF THE FRAUD

143.    To induce Plaintiffs to promptly reimburse their claims for Rental DME, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- Malaydakh, through Trend Med, routinely and deliberately submitted claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- Malaydakh, through Trend Med, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;

- Malaydakh, through Trend Med, knowingly misrepresented and concealed that Trend Med's claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the

Defendants and the No-fault Clinics in order to maximize reimbursement; and/or

- Malaydakh, through Trend Med, knowingly and deliberately concealed the amounts Trend Med was entitled to be reimbursed in the bills submitted to Plaintiffs by mispresenting the codes and reimbursement amounts as part of the scheme to manipulate the payment formulas under the applicable DME Fee Schedule in order to maximize the charges that they could submit to Plaintiffs and other insurers.

144.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $109,000.00 based upon the fraudulent bill submissions.

145.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANT MALAYDAKH, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

### (RICO, pursuant to 18 U.S.C. § 1962(c))

146.    The allegations of paragraphs 1 through 145 are hereby repeated and re-alleged as though fully set forth herein.

**THE RICO ENTERPRISE**

147.    At all times relevant herein, Trend Med, Inc was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

148.    From, in or about November 5, 2018 through the date of the filing of this Complaint, Defendants Malaydakh, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, knowingly conducted and participated in the affairs of the Trend Med enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

149.    At all relevant times mentioned herein, Defendant Malaydakh, together with others unknown to Plaintiff, exerted control over and directed the operations of the Trend Med enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the utilization of fraudulent prescriptions.

150.    One or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing DME pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as well as bogus documentation, that grossly inflated the purported cost and/or necessity of the DME to facilitate the fraudulent billing alleged in the Complaint.  One or more of the ABC Corporations furnished documents that Defendant Malaydakh required, in furtherance

of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims.

151.    It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

152.    The racketeering acts set forth herein were carried out on a continued basis for more than a five-year period, were related and similar and were committed as part of the ongoing scheme of Defendant Malaydakh, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

153.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Trend Med continues to pursue collection on the fraudulent billing to the present day.

154.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Malaydakh, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Trend Med enterprise based upon materially false and misleading information.

155. Through the Trend Med enterprise, Defendant Malaydakh submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous Covered Persons as billed. The bills and supporting documents that were sent by Malaydakh, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Malaydakh, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Trend Med enterprise through the filing of this Complaint.

156. A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Malaydakh in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

157. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

158. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

159. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $109,000.00, the exact amount to be determined at trial.

160.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Malaydakh, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**AGAINST DEFENDANTS TREND MED AND MALAYDAKH**

**(Common Law Fraud)**

161.    The allegations of paragraphs 1 through 145 are hereby repeated and realleged as though fully set forth herein.

162.    Defendants Trend Med and Malaydakh made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

163.    Each and every bill and supporting documentation submitted by Defendants Trend Med and Malaydakh to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to Covered Persons. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Covered Persons and the consumer public.

164.    Defendants Trend Med and Malaydakh intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and medical necessity of the Rental DME purportedly supplied to Covered Persons;

- False and misleading statements as to the amounts Trend Med was entitled to be reimbursed under the No-fault Law;

- False and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the Covered Persons; (b) not billed in excess of the maximum permissible monthly rental charge or maximum accumulated rental charge for such equipment, supplies and services provided on a rental basis under the applicable Fee Schedule; (c) not billed in excess of the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office if no maximum monthly rental rate is provided in the applicable Fee Schedule for dates of service prior to April 4, 2022; and/or (d) not billed in excess of the lesser of the providers' acquisition cost plus 50% or the usual and customary price charged by durable medical equipment providers to the general public if no maximum monthly rental rate is provided in the applicable Fee Schedule for dates of service after April 4, 2022;

- False and misleading prescriptions for the Rental DME purportedly supplied to Covered Persons containing identical boilerplate language misrepresenting the medical necessity of the item being prescribed; and/or

- False and misleading prescriptions for DME, concealing the fact that the (a) DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby Defendant Malaydakh, through Trend Med, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME; (b) DME was not covered by the applicable DME Fee Schedule; and (c) DME was generically described on the prescriptions, all of which was designed to permit Defendant Malaydakh, through Trend Med, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

165.     The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Trend Med's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

166.     Defendants Trend Med and Malaydakh knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

167.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Trend Med and Malaydakh.

168.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions, and delivery receipts, they would not have paid Defendants Trend Med's claims for No-fault insurance benefits submitted in connection therewith.

169.    Furthermore, the far-reaching pattern of fraudulent conduct by Defendants Trend Med and Malaydakh evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed, and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

170.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined but believed to be in excess of $109,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

### THIRD CLAIM FOR RELIEF

### AGAINST DEFENDANTS TREND MED AND MALAYDAKH

### (Unjust Enrichment)

171.    The allegations of paragraphs 1 through 145 are hereby repeated and realleged as though fully set forth herein.

172.    By reason of their wrongdoing, Defendants Trend Med and Malaydakh have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

173.    Plaintiffs are therefore entitled to restitution from Defendants Trend Med and Malaydakh in the amount by which it has been unjustly enriched.

174.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $109,000.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

**FOURTH CLAIM FOR RELIEF**

**AGAINST THE RETAIL DEFENDANTS**

**(Declaratory Judgment under 28 U.S.C. § 2201)**

175.    The allegations of paragraphs 1 through 145 are hereby repeated and realleged as though fully set forth herein.

176.    At all relevant times mentioned herein, each and every bill mailed by Malaydakh, through Trend Med, to Plaintiffs sought reimbursement in excess of the amounts authorized by the No-fault Law and effective DME Fee Schedule by materially misrepresenting the Rental DME provided, if provided at all, as well as the cost and quality of the billed for Rental DME.

177.    To the extent the Rental DME was provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

178.    At all times relevant herein, the Retail Defendants exploited the No-fault Law and applicable Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the amounts the Defendants were entitled to be reimbursed, as well as the medical necessity of the items purportedly provided to Covered Persons.

179. In view of the Retail Defendants' submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Retail Defendants have no right to receive payment for any pending bills it has submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and/or

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

180. As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the Rental DME purportedly supplied to Covered Persons and the amounts it was entitled to be reimbursed, in order to manipulate the payment formulas under the No-fault Law and effective DME Fee Schedules in its claims submissions, obtain reimbursement far in excess of the maximum permissible charges it was entitled to receive for medically unnecessary items provided pursuant to a fraudulent protocol of treatment, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of the Retail Defendant's No-fault claims.

181. Plaintiffs have no adequate remedy at law.

182. The Retail Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)      Compensatory damages in an amount in excess of $109,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)      Punitive damages in such amount as the Court deems just;

iii)      Treble damages, costs, and reasonable attorneys' fees on the First Claim for Relief, together with prejudgment interest;

iv)      Compensatory and punitive damages on the Second Claim for Relief, together with prejudgment interest;

v)      Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)      Declaratory relief on the Fourth Claim for Relief, declaring that Plaintiffs have no obligation to pay any No-fault claims submitted by Retail Defendants because (1) Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and (2) Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity; and

vii)      Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York,
       March 15, 2024

                                             Morrison Mahoney LLP

                                             By:   /s/ Lee Pinzow
                                                 Robert A. Stern, Esq.
                                               James McKenney, Esq.
                                               Lee Pinzow, Esq.
                                             Attorneys for Plaintiffs
                                             Wall Street Plaza
                                             88 Pine Street, Suite 1900
                                             New York, New York 10005
                                             (212) 825-1212

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,**<br><br>**Plaintiffs,**<br><br>-against-<br><br>**TREND MED, INC, ANASTASIA MALAYDAKH, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,**<br><br>**Defendants.** | **CIVIL ACTION**<br><br>**24-CV-1929**<br><br>**COMPLAINT**<br><br>**(TRIAL BY JURY DEMANDED)** |

# COMPLAINT

**MORRISON MAHONEY, LLP**
**ATTORNEYS FOR PLAINTIFFS**
**WALL STREET PLAZA**
**88 PINE STREET, SUITE 1900**
**NEW YORK, NEW YORK 10005**
**TELEPHONE: (212) 825-1212**